21749. DYE v. THE STATE.

Argued September 10, 1962—Decided October 1, 1962.

*Robert E. Knox, Warren D. Evans,* for plaintiff in error.

*Kenneth Goolsby, Solicitor General, Randall Evans, Jr., Eugene Cook, Attorney General, Rubye G. Jackson, Assistant Attorney General,* contra.

MOBLEY, Justice. ■ In special ground 4 defendant assigns error on the following charge: "I charge you, gentlemen of the jury, you will observe that in all cases of voluntary manslaughter, there must be some actual assault upon the person killing or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances sufficient to justify the excitement of passion and exclude all idea of deliberation or malice. Evidence of such assault may be found in a mutual intention to fight and in the fact that there was an approach by the deceased to the defendant in the furtherance of this design when it was not necessary for him to do so in self-defense.

"I charge you, gentlemen of the jury, if you believe from all the facts and circumstances of this case beyond a reasonable doubt, including the defendant's statement, that there was a mutual intention to fight and that there was a mutual combat, that the defendant killed the deceased, then in order for the defendant to claim self-defense, it must appear that the danger was so urgent and pressing at the time of the killing, that in order to save his own life the killing of the deceased was absolutely necessary. It must also appear that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given."

Defendant contends that the charge was erroneous because under no theory of the evidence or defendant's statement was mutual combat involved; that it led the jury to believe that, before defendant would be justified in the killing, an actual ne-

cessity must have existed to take the life of the deceased to save his own life, and that it excluded the defense of defendant that he killed the deceased acting under the fears of a reasonable man that his life was in danger and that a felony was about to be committed upon him.

The charge complained of included *Code* § 26-1014, which this court has held in numerous cases "is neither required nor authorized" where under no theory of the evidence or defendant's statement was mutual combat involved. *Bivins v. State,* 200 Ga. 729, 733 (2) (38 SE2d 273), and cases cited therein. "Where the State's evidence makes a case of murder, and the defendant's statement and his evidence shows a case of justifiable homicide, a charge upon the law of voluntary manslaughter as applicable to mutual combat is neither required nor authorized." *Porter v. State,* 213 Ga. 325, 326 (99 SE2d 110).

An inference could not be drawn from the evidence or the defendant's statement that mutual combat was involved in this case. The evidence was as follows: Defendant and his wife, Flay Dye and his wife, and the wife of the deceased, Otis Rabun, had gathered in the house of Flay Dye to watch television. Defendant had been drinking and was talking and disturbing those trying to look at television. In walking across the room defendant struck the sore knee of Mrs. Otis Rabun, the deceased's wife. Words passed and defendant slapped Mrs. Rabun, bruising her eye and loosening a tooth. Flay Dye told his brother, the defendant, to leave his house and when the defendant refused, Flay wrestled him out. Defendant left in his automobile, saying that he would be back. Mrs. Rabun went across the street to her home and awakened her husband who was sleeping before going to work at midnight. Flay Dye and his wife and defendant's wife and children also went over to Rabun's house. Rabun called the police, they came out, took the report, and left to find the defendant. Within a few minutes the defendant drove up in his car, parked in front of Flay Dye's house, got out and with his rifle in his hands went in and through Flay Dye's house and then started walking toward Rabun's house. At about the time defendant started up the steps Rabun asked his wife for his pistol, saying, "Give me my gun." Defendant

walked up on the porch with rifle in hand and asked if his wife and children were there. Rabun answered that they were, that they could come out, and for him not to come in his house. Defendant said he was not coming in. As defendant's wife with her child in her arms got to the door, and about the time her hand reached the doorknob, the defendant started shooting into the room where all the named parties were. Defendant's wife and child were both shot and fell to the floor and Otis Rabun was shot and killed. Eight shots were fired into the house. Three shots were fired from inside the house, as shown by bullet holes in the door, and the defendant was hit in the shoulder by a bullet from Otis Rabun's pistol. There was testimony that the first shot came from the porch, and other evidence that "I couldn't say about the shooting going both ways, just right and left all at the same time, but they was firing, all the firing was shot at one time." There was evidence that the defendant was under the influence of intoxicants when arrested.

The defendant in his statement stated that he left his brother Flay's house, as he was told to do, went home, stayed until he thought his wife and children had finished seeing the television show, then drove back over there to get them and when he did not find them at Flay's, he went over to Otis Rabun's house to see if they were there and to take them home. The following is his entire statement as to the shooting: "I thought they was over there watching TV so I started up the doorsteps, and I noticed the door was cracked, and I could hear Mr. Rabun say, 'Give me my gun, give me my gun, give me my gun.' By that time I was half-way up the doorsteps. I stopped. Mr. Rabun says, 'What do you want?' I says, 'Is Betty and the children over here?' That was my wife. He said, 'Yes.' I said, 'Tell them to come on and let's go home.' He said, 'Well, go on.' Said, 'Just don't have no trouble.' I said, 'I'm not.'

"So I walked on back out in the middle of the road and was standing there in the middle of the road, turned around, and I was facing the house, just like I am facing you all, waiting on my wife and children to come. Well, he cut loose to shooting me. He shot me in the shoulder right there (indicating). Well, when he shot me, it liked to knocked me slap down. It turned

me all the way round. Well, that was all I could remember for a pretty good little bit."

No other evidence was offered by defendant as to how the killing occurred. A pistol expert testified that the bullet taken from defendant's shoulder was shot from the deceased's pistol.

Clearly there is no evidence of mutual intention to fight. The charge complained of was erroneous requiring a new trial. See *Bivins v. State*, 200 Ga. 729, supra.

■ Special ground 5 complains of the exclusion from evidence of a statement made by the defendant to one of the arresting officers, to the effect that "they shot me first," on the ground that the statement was part of the res gestae.

The trial judge was justified in concluding that the declaration was not so nearly connected with the killing as to be free from all suspicion of device or afterthought. There was some evidence that the officers arrived in five or six minutes after they were called, which call was made after all the shooting was over, and the court might have concluded that it was longer, perhaps fifteen or more minutes. But regardless of time, the defendant was not to be seen when the officers arrived but appeared shortly from around Flay Dye's house. He did not have his rifle with him. It was found later by police officers and turned over to the sheriff. His statement was that he was unconscious from the time he was shot until he heard the officers talking, but one of the officers testified he told him that he was standing behind a tree when they drove up and that his rifle had jammed. The doctor testified that in his opinion the pistol shot in the shoulder would not have rendered the defendant unconscious.

"No precise point of time can be fixed a priori where the res gestae ends. Each case turns on its own circumstances. Indeed, the inquiry is rather into events than into the precise time which has elapsed. Is the proof offered of a matter fairly a part of the same transaction? Is it an event happening naturally and spontaneously as a part of the occurrence under investigation? If so, the law permits it to be proven as part of it, since the whole scene, as it has transpired, ought to appear to the tribunal called upon to determine its character. Matters

occurring before or after, that is, before the transaction begun or after it ended, are not part of it. To make them such, they must be so nearly connected with the actual occurrence as to be without the suspicion of afterthought or forethought. . . They must be within the shadow, as it were, of the transaction itself." *Hall v. State,* 48 Ga. 607, 608.

Here the transaction had ended, the accused had shot and killed the deceased. Several minutes had elapsed before the officers arrived, and the accused had been placed under arrest when the statement was made. It was not a natural and spontaneous utterance, is not free of the suspicion of afterthought, and in fact the trial judge was authorized to conclude that it was nothing more than a self-serving declaration made to the arresting officer after ample time had elapsed for the accused to plan the statement as a part of his defense. The court properly excluded it from evidence.

■ Grounds 6, 7, and 8 which complain of the admission of testimony that defendant's wife and baby were shot and pointing out on the witness' body where they were shot are without merit as similar evidence was admitted without objection. *Pierce v. State,* 212 Ga. 88 (1) (90 SE2d 417). Furthermore as they were shot in the same transaction by some of the eight bullets fired by the defendant, one of which killed the deceased, the evidence was admissible as a part of the res gestae, showing a reckless disregard for human life from which a presumption of malice may arise. *Fowler v. State,* 189 Ga. 733, 734 (2) (8 SE2d 77); *Myrick v. State,* 199 Ga. 244 (1) (34 SE2d 36).

■ Special ground 9 complains of the admission of a shotgun into evidence over defendant's objection. The court in admitting it stated, "I will admit it just as a circumstance." The shotgun was not the weapon with which the deceased was killed. However, at the time the defendant left the altercation at his brother's house he had stated, "I'll be back." He did return with a rifle and a shotgun. With the rifle in his hands he went looking through his brother's house for those with whom he had had the altercation, then proceeded to the deceased's house and fired eight bullets into the house. Under these circumstances the shotgun was admissible as a circumstance to

show premeditation and malice. See *Goodman v. State,* 184 Ga. 315 (191 SE 117). It would tend to illustrate to the jury the state of mind of the defendant in providing himself with weapons to return to the place where he had the altercation for the purpose of shooting those with whom he had the trouble. If the defendant desired a specific charge on the circumstance for which the gun was admitted he should have requested it or he should have asked the court at the time it was admitted on what circumstance he admitted it. Special ground 9 is without merit.

*Judgment reversed. All the Justices concur.*